### Levi L. Leach et al. v. Patrick Durkin.

1. Personal Injuries—*Proximate Causes and Questions of Fact.*—On the trial of a suit for personal injuries resulting from the fall of a brick from a building in the process of construction, the whole subject of where the brick came from and whether its falling was the result of

the carelessness of the defendant's servants. is one which, under the circumstances of this case, was properly submitted to the jury.

2. REMITTITUR—*Powers of the Court When the Verdict is Excessive.*—Where, on an appeal from a judgment for personal injuries, the Appellate Court is of the opinion that such judgment is excessive, it may order that it be affirmed, provided a sum certain is remitted; otherwise that it be reversed and remanded.

**Trespass on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900. Affirmed provided a remittitur be entered, otherwise reversed and remanded. Opinion filed November 26, 1901. *

WALL & Ross, attorneys for appellants; PERCY WERNER, of counsel.

THEODORE G. CASE, attorney for appellee.

MR. JUSTICE SHEPARD delivered the opinion of the court.

This appeal is from a judgment of $2,000, entered on a verdict for that amount, in a suit by appellee to recover for injuries received by him through the alleged negligence of appellants.

The errors mainly relied on for a reversal, are directed to the sufficiency of the evidence to sustain the verdict. The specific act charged by the declaration as constituting the negligence relied upon, is the letting fall of a brick or fragment of a brick from the top of a wall being constructed by appellants, upon the head of the plaintiff, who was working below.

At the time of the accident a power house for the Chicago City Railway Company was in process of construction. It was a large building, about 300 feet long, extending east and west, and two hundred feet wide. Separate contracts for doing the work had been let to various contractors, the carpenter work only being done by the railway company itself. The appellants had the contract for doing the stone and brick-work, and Bishop & Catlin, for whom appellee worked, had the contract for putting in the boilers and setting their brick foundations.

---

*Remittitur filed and cause affirmed December 2, 1901.

Running through the entire length of the building was a brick firewall, two or three feet thick and forty or fifty feet high, which was nearly completed. Because of the thickness of this wall, and for convenience in putting it up, the method of building the wall was to lay up its north side or face, about three feet at a time, and then from the other or south side, build up the remainder. At the time of the accident the face or north side of the wall had been entirely completed to a point to receive the coping, and no masons were any longer working on that side of the wall. They were wholly at work on the south side of the wall, and stood on a scaffold that rested on the roof and was more than ninety feet long.

The twenty-four boilers that Bishop and Catling were putting in, were located in the northwest part of the basement of the building and about three feet from the north side of this firewall. There were four openings or manholes through the wall, through which the workmen about the building could pass from one side of the wall to the other. Durkin was a mortarman. His duties were to mix the mortar and carry it to the workmen who were laying the boiler foundation. The mortar bed or box was situated on the north side of the wall, near the boilers and about ten feet from the wall. The water supply, to mix the mortar with, came from a hydrant or pipe south of the wall and about three feet from it. Durkin passed through one of these manholes to the place where the water faucet was, on the side of the wall, and after turning the water on, started to go back.

Just after getting up from turning on the water, a piece of brick came down from above and struck him on the head inflicting the injuries of which he complains. Durkin did not see where the brick came from. A witness called by Durkin, testified on cross-examination that he was at work tempering mortar with Durkin; that he saw the brick fall and picked it up; that it came down between the wall and the scaffold, on which the brick-masons were working on top. He then stepped out and hollered up to the masons to

stop dropping bricks, that they had killed a man. He also testified he could not say how wide the space was between the scaffold and the wall, but it was wide enough for a brick to easily fall through. He also said he did not see the brick coming down through the air, but only after it struck Durkin. Another of Durkin's witnesses testified on his cross-examination that he saw Durkin just as the brick fell on him; that he saw the mason that dropped the brick let it fall, and that he was working right overhead from where Durkin was when struck. He also testified that no carpenters were working above where Durkin was.

Appellants claim that Durkin was on the north side of the wall, when hurt, and that because no masons were at that time working north of the wall, but only carpenters, the brick must have fallen through the negligence of the carpenters, and not of the masons. Tending to corroborate appellants' claim in that regard, there was evidence that the roof on the south side of the wall and under the mason's scaffold was finished, while on the north side of the wall the roof was open and unfinished, and carpenters were at work there taking roof boards across from the south side of the wall to the north side of it. Appellants also contend that none of the masons were at work over the manhole through which Durkin passed, and near which he was hurt.

According to appellants' own showing the masons were using a scaffold that was more than ninety feet long, and it would seem that this scaffold extended over or very near to a point above where Durkin was hurt. The section of the wall that was being built up at that time, extended from a point about forty feet west of the center of the wall to a point about twenty-five feet east of the center. How much the scaffold reached beyond these points at either end is not made to appear, only that it was "more than ninety feet long." Appellants' superintendent testified that he did not know where, within this distance, his men were working at the instant Durkin was hurt. This same witness testified that Durkin could not get hurt at the center door

or manhole, because that door "was protected." * * * "It was all covered with timbers." He also testified he knew where Durkin was hurt, and that "it was at one of these three doors that was unprotected," to the east of the center manhole.

Another witness for appellants testified that he was one of the masons on the scaffold and was working nearest to where Durkin was hurt, and was nine feet west of the manhole nearest to the mortar bed; that he saw the brick held up by the man below, as the one that hit Durkin, and that he saw Durkin after he was hurt, walking north from the wall opposite this manhole.

The only manner in which the testimony for appellee that the brick came down between the scaffold and the wall has been contradicted, is by showing that the roof beneath the scaffold was completed. If that roof were finished tight up against the wall, it would, it seems, have been an easy matter for appellants to have shown it; but that was not done or attempted. True, the testimony of appellants' witness who was working nearest over where Durkin stood, was that he was nine feet west of Durkin, but no one saw the brick while it was descending, and it would be matter for fair inference by the jury whether or not a brick falling through the air near to a brick wall might not be deflected nine feet from the perpendicular by hitting against the wall or some other object. The whole subject of where the brick came from, and whether its falling was the result of the carelessness of appellants' servants, was one which, under the evidence, was properly submitted to the jury, and the requested instruction to find for the appellants was properly refused. Illinois Central R. R. Co. v. McNicholas, 98 Ill. App. 54.

There was not between these parties any relation of master and servant, or of fellow-servant, nor do the duties that arise out of either of such relationships have any application to the controversy. It is simply the case of the duty which one performing work owes to another who is rightfully on the premises, to exercise ordinary care not to

injure him.    The case was tried upon this theory by both
sides, and has so been presented here.    It was for the jury
to decide whether, under all the evidence, ordinary care was
or was not exercised.

The railway company was sued jointly with the appel-
lants, and after the appellee had announced that he rested
his case, the company moved the court to instruct the jury
to find the company not guilty, and the appellee's counsel
assented to the motion being allowed.    After that was
done, appellee asked and obtained leave to call a witness
who had just come into the court.

It is claimed it was error for the court to give the per-
emptory instruction at the conclusion of a part of appel-
lee's case.    It is conceded by counsel for appellants that
there was not sufficient evidence on which a verdict could
have been sustained against the railway company, but is
insisted that appellants' case was jeopardized by granting
the motion at that stage of the trial.

It is usually a matter wholly within the discretion of the
trial judge to admit evidence at any time during the prog-
ress of a trial.    There seems in this case to have been a
good reason stated for the calling of this delayed witness
after appellee had once formally rested his case.    We can
not assent to the force of appellants' argument that giving
the peremptory instruction in favor of the railway company
at the time it was given, and the denial at the same time
of a similar instruction asked in favor of appellants,
amounted to such an intimation by the court unfavorable
to appellants' side of the case as to require a setting aside
of the verdict.    The most that can be said of the action is
what is always experienced when a peremptory instruction
is given for one joint defendant and refused to another.
Counsel give no authority in support of their contention,
and we think none exists.    The further contention is that
the appellants' counsel should have been permitted to argue
to the jury that the circumstance that appellee con-
sented to the giving of the instruction in favor of the rail-
way company showed an agreement between the railway

company and appellee to free the company from liability and to saddle it on appellants. There is no evidence upon which to base such an argument, beyond the mere fact of it being conceded that no sufficient evidence had been elicited to show the liability of the railway company. It would have been competent for appellant to show all the facts that would relieve them from liability, after as well as before the company was out of the case. We think there was no error in the respects mentioned.

It is next claimed the judgment is excessive. The appellee was not hurt very seriously. According to his own testimony he was laid up only about two weeks before beginning work again, and lost only about six months' time from the time of the accident. His subjective symptoms are that in cold weather his head gets clogged up, and in summer he can not stand out in the heat as much as formerly. We think twelve hundred dollars is ample compensation to him. If, therefore, he shall within ten days, in this court, enter a remittitur of eight hundred dollars from the judgment the judgment will be affirmed for the balance, otherwise it will be reversed and the cause remanded.

Affirmed if remittitur be entered, otherwise reversed and remanded.